**In re The CARA CORPORATION,**
**Debtor.**

**Bankruptcy No. 90–15397S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 15, 1992.

See also 148 B.R. 760.

Melvin Lashner, Lewis Kates, Philadelphia, PA, for debtor.

Alan Gershenson, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Bank.

Andrew N. Schwartz, Philadelphia, PA, for Creditors' Committee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

At issue is the validity of a security interest claimed by Continental Bank ("the Bank") in the accounts receivable and other general intangibles of CARA CORPORATION ("the Debtor").

The secured indebtedness, asserted to be $259,300.68 in the Bank's proof of claim, is based upon loans made on July 18, 1984, and August 26, 1986. The requisite financing statement was recorded on November 17, 1983 ("the 1983 Financing Statement"), and was based upon a loan agreement of January 3, 1973 ("the 1973 Agreement"), which had been liquidated in January, 1983. The financing statement was renewed by a continuation statement filed on June 23, 1988.

The Objection to the Bank's secured status in issue ("the Objection") was filed by the Debtor on January 9, 1992. The Objection asserts that, subsequent to August 26, 1986, the parties entered into a new loan agreement on January 12, 1987. It contends that

[n]o financing statement was ever filed relating to the above referenced security agreement as required by the Pennsylvania Uniform Commercial Code to give notice to creditors of any new security agreement. [Therefore, the] ... Bank does not have a signed security agreement filed of record relating to assets described in the January 12, 1987 agreement and does not have a lien on any of the assets described in the January 12, 1987 agreement.

Resolution of the Objection was deferred pending the resolution of a totally different attack on the Bank's claim set forth in a lender-liability proceeding brought by the Debtor against the Bank. On October 23, 1992, this court filed an Opinion and Order, presently reported only at 148 B.R. 760 (cited hereafter as *"Cara I"*), which recites in detail the complete history of this case, 148 B.R. at 762–766; grants the Bank's motion for a summary judgment; and dismisses that proceeding. In the Order accompanying *Cara I,* at 779, we scheduled a conference on the status of the case in light of that decision on November 4, 1992.

Despite our expression in *Cara I, id.,* of "unchanging skepticism" regarding the merits of the Objection since its substance was asserted at the outset of the case in January, 1991, *id.* at 763, we agreed, after a colloquy of November 4, 1992, to allow the Debtor to brief the Objection along with the Bank, with opening submissions to be filed and served by November 30, 1992, and reply submissions to be presented by December 7, 1992.

On December 2, 1992, having received the parties' initial submissions, we entered an Order requesting them to address the following issues in their reply submissions:

1. In what documents, if any, does the Bank claim to have taken a security interest in machinery, equipment, furniture, or fixtures of the Debtor?

2. Has the Bank filed the appropriate continuation statements?

In responding to ¶ 1 and 2, Affidavits and relevant documents may be submitted by the parties in making their responses.

3. Does any failure to include certain items in the documents or to make the appropriate filings render the Bank's secured status subject to attack?

4. Can this court consider the issues of the scope of the Bank's security interest and the propriety of the continuation statements in light of the apparent failure of the Debtor to raise these issues over the long pendency of its Objection?

In its reply, the Bank disavowed any security interest in the Debtor's machinery, equipment, furniture, or fixtures. The Debtor attempted to explain its failure to focus on the issues raised by the court to its preoccupation with the ill-fated lender-liability proceeding, noting that it had appealed the decision in *Cara I*.

■ Our analysis of the issue before us begins from the observation "that those aspects of a proof of claim which are not challenged are presumed valid. See, e.g., *In re Allegheny Int'l. Inc.*, 954 F.2d 167, 173 (3rd Cir.1992)." *In re Compass Marine Corp.*, 146 B.R. 138, 162 (Bankr. E.D.Pa.1992). Therefore, we can only consider the issues actually raised in the Objection in determining the validity of the Bank's secured status.

■ We begin our legal analysis by observing that

> [t]wo documents are generally required to create a security interest: a security agreement and a financing statement. *In re Bollinger Corp.*, 614 F.2d 924, 926 (3rd Cir.1980); *In re Sandler*, 20 B.R. 540, 541 (Bankr.W.D.Pa.1982); and *In re H.L. Clement Co.*, 12 B.R. 165, 167 (Bankr.W.D.Pa.1981).

*In re Modern Laundry & Dry Cleaning Co.*, 1992 WL 295827, slip op. at *1 (Bankr. E.D.Pa. October 15, 1992). However, it is well established that a duly-executed security agreement or financing statement can be interchangeably used to constitute both documents. *Bollinger, supra,* 614 F.2d at 925; and *Modern Laundry, supra,* slip op. at *1.

It was therefore permissible for the Bank to utilize the duly-executed 1973 Agreement as the basis for its subsequent financing statement, provided that the 1973 Agreement expressly permitted such a use.

The 1973 Agreement provides, in pertinent part, as follows:

> 3. To secure payment of all loans made *and to be made* by Bank to Borrower and to secure *all other indebtedness of Borrower to Bank* now in existence or *hereafter arising,* Borrower hereby assigns to Bank and grants to Bank a security interest in all accounts receivable now *or hereafter owing to Borrower,* together with all monies due or *to become due thereunder* and any notes, invoices, contracts, books, records and other evidences thereof, all Borrower's rights, powers and privileges with respect to any merchandise, the sale of which was given *or may give rise to such accounts* and all general intangibles now owned or *hereafter acquired,* which means all personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents, and instruments, including but not limited to, records, ledgers, books, journals, check books, printouts, blue prints, designs, computer programs, computer tapes, punch cards and all other computer software, formulae, drawings, patents, trademarks, tradenames and copyrights (emphasis added).

Despite the apparent scope of the security interests taken therein to include future advances, the Debtor nevertheless argues that the lapse in the parties' borrower-lender relationship terminated the power of the 1973 Agreement to give the Bank a right to utilize that Agreement as a basis to secure future advances. It also notes that the 1983 Financing Statement was recorded during the interim period of this lapse.

■ The clause of the 1973 Agreement in issue quoted above is properly characterized as a "dragnet clause." *See In re Shapiro,* 109 B.R. 127, 128 (Bankr.E.D.Pa. 1990); and Annot., *Debts Incurred in Provisions of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status,* 3 A.L.R.4th 690, 694–95 (1981) (cited hereafter as "Annot."). The issue is whether, in the instant circumstances, a dragnet clause is enforceable so as to validate the 1983 Financing Statement and to render the 1984, 1986, and

1987 loans secured, at least as between the parties.

Applying the considerations which we voiced in *Shapiro, supra*, 109 B.R. at 134–35, citing Annot., *supra*, 3 A.L.R.4th at 695–96, 697–98, 716; and *In re Morrison*, 69 B.R. 586, 590–92 (Bankr.E.D.Pa.1987), we believe that it is.

First, we note, as we did in *Morrison*, 69 B.R. at 590, that the Debtor is not attacking the Bank's claim in the shoes of a trustee or an ideally-situated creditor pursuant to 11 U.S.C. § 544. Therefore, the Debtor's status, as a party to the transactions and the beneficiary of the loan proceeds, is significant.

The tests utilized in *Shapiro, supra*, 109 B.R. at 134, were as follows:

(1) Whether the other indebtednesses allegedly covered by the mortgage are [specifically expressed] therein ...; (2) Whether the other indebtednesses allegedly covered are "of the same class" as the debt referenced in the mortgage....; (3) Whether the other indebtednesses were intended to be separately secured....; and (4) Whether the mortgagee relied on the clause in making further loans....

There are no references to the specific later loans in the 1973 Agreement. However, unlike the loans at issue in *Shapiro*, where the loans which creditor attempted to sweep into the scope of debts which were secured under the dragnet clause preceded the execution of the security agreement, *id.*, and no such references *could* be made, the specific terms of the 1984, 1986, and 1987 loans could not have been foreseen when the 1973 Agreement was executed.

The later loans by the Debtor from the Bank were, again in contrast to the loans which were attempted to be swept under the dragnet clause in *Shapiro, id.*, of the same purpose and in the same class as the loans underlying the 1973 Agreement.

Thirdly, once again in contrast to the facts in *Shapiro, id.*, there was no security separate from that allegedly included by means of the dragnet clause which was taken by the secured party in the instant loan. If not for the combined impact of the 1983 Financing Statement and the 1973 Agreement, as the Debtor argues is in fact the case, the loans in issue would be totally unsecured.

Finally, again in direct contrast to *Shapiro*, where the dragnet clause was in a document executed over two years *after* the transaction which it purported to secure had occurred, *id.* at 134–35, it is clear that the Bank relied on the efficacy of the dragnet clause in the 1973 Agreement as the basis for making the 1984, 1986, and 1987 loans. The 1987 loan contract expressly provides that "Borrower has executed Security Agreements, Financing Statements, and other documents necessary to grant unto Bank a first perfected security interest" in the secured property in issue. The fact that the Bank saw fit to record the 1983 Financing Statement at a time when the Debtor's prior loan was liquidated attests to the Bank's intention to secure subsequent loans thereby. No other basis for incurring the trouble or expense of recording the 1983 Financing statement, *other* than to secure future loans, is conceivable. There is no allegation that the Debtor was unaware of the presence of the 1983 Financing Statement, and it seems clear that it understood, when making the 1984, 1986, and 1987 loans, that they were secured by the 1983 Financing Statement. Again, we note that the Debtor signed the 1987 Agreement, which provides that it has executed documents necessary to create the pertinent security interests, which presumably referenced the 1973 Agreement.

■ It is clear, under the reasoning of *In re Gilchrist Co.*, 403 F.Supp. 197, 199, 201–02 (E.D.Pa.1975), *aff'd*, 535 F.2d 1246 (3rd Cir.1976), that a lapse in a loan relationship does not invalidate a security arrangement if the parties do not so intend. It is clear to us that the Bank intended to advance only secured credit to the Debtor and that the Debtor, too, was quite aware of, and intended to make, a secured loan from the Bank.

The Debtor's attempt to distinguish *Gilchrist* on the ground that the 1973 Agreement was not itself renewed by continuation statements must be rejected. The 1983 Financing Statement filing, since it was validly based on the 1973 Agreement, was sufficient in itself to create a security interest. It is not disputed that a valid continuation statement was filed in reference to the 1983 Financing Statement.

Consequently, we will enter an Order overruling the Debtor's Objection to, and sustaining the validity of, the Bank's secured claim.